ROBERT B. HUTCHINSON (45367)
rhutchinson@cpmlegal.com
NEDA L. LOTFI (290213)
nlotfi@cpmlegal.com
JOEL M. GORDON (280721)
jgordon@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Boulevard, Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008
Facsimile: (310) 392-0111

*Counsel for Plaintiff Sara Ebrahimi, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA EBRAHIMI, an individual, <br><br> **Plaintiff,** <br><br> v. <br><br> MENTOR WORLDWIDE LLC; JOHNSON & JOHNSON SERVICES, INC; and DOES 1-50 <br><br> **Defendants.** | Case No. 2:16-cv-07316-DMG-KS <br><br> Hon. Dolly M. Gee <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** <br><br> DATE: February 10, 2017 <br> TIME: 9:30 A.M. <br> COURTROOM: 8C |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS;**
Case No. 2:16-cv-07316-DMG-KS

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................... 1

      A.    PMA Approval ................................................................................ 1

      B.    PMA-Mandated Studies ................................................................. 2

      C.    Ms. Ebrahimi's Injuries ................................................................. 3

III.  LEGAL ARGUMENT ............................................................................... 5

      A.    Legal Standard ................................................................................ 5

      B.    Parallel State Claims Are Not Preempted By Federal Law ........... 6

            1.    Mentor Failed to Report Adverse Effects to the FDA ........... 9

            2.    Plaintiff Establishes a Casual Nexus Between Alleged Injury and Violation ........ 11

            3.    Manufacturing Defect Claim Is Not Expressly Preempted ............... 12

      C.    Negligence Per Se .......................................................................... 14

IV.   CONCLUSION .......................................................................................... 14

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

## TABLE OF AUTHORITES

**Page(s)**

**Cases**

*Anderson v. Owens-Corning Fiberglass Corp.,*
    53 Cal. 3d 987, 1002, 281 Cal. Rptr. 528, 537, 810 P.2d 549 (1991) .......................... 9

*Ashcroft v. Iqbal,*
    556 U.S. 66 (2009) ........................................................................................................ 6

*Barker v. Lull Eng'g Co.,*
    20 Cal. 3d 413, 429, 143 Cal. Rptr. 225, 235, 573 P.2d 443 (1978) ........................ 12

*Bausch v. Stryker Corp.,*
    630 F.3d 546 (7th Cir. 2010) ................................................................................... 8, 13

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 570, 127 S. Ct. 1955 (2007) ................................................................. 6

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341, 121 S. Ct. 1012 (2001) ................................................................. 5, 7, 8

*Burgos v. Satiety, Inc.,*
    Docket No. 10-CV-2680, 2011 WL 1327684 at *2 (E.D.N.Y. April 5, 2011) ........... 13

*Chambers v. Osteonics Corp.,*
    109 F.3d 1243 (7th Cir. 1997) ................................................................................... 13

*Dirosa v. Showa Denko K.K.,*
    44 Cal. App. 4th 799, 808, 52 Cal. Rptr. 2d 128 (1996) ........................................... 14

*Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.,*
    213 F.3d 17 (4th Cir. 2000) ........................................................................................ 6

*Eidson v. Medtronic, Inc.,*
    40 F. Supp. 3d 1202 (N.D. Cal. 2014) ...................................................................... 11

*Funke v. Sorin Grp. USA, Inc.,*
    147 F. Supp. 3d 1017 (C.D. Cal. 2015). ................................................................... 12

*Hofts v. Howmedica Osteonics Corp.,*
    597 F. Supp. 2d 830 (S.D. Ind. 2009) ...................................................................... 12

*Medtronic, Inc. v. Lohr*
    518 U.S. 470, 116 S. Ct. 2240 (1996) ............................................................... 6, 7, 8, 9

*Meyers v. Lance*
    Case No. 4:12-cv-215 (CDL), 2012 U.S. Dist. LEXIS 175537, *1-2 (M.D. Ga. Dec. 12, 2012) . 6

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

*Mitchell v. Collagen Corp.*
    126 F.3d 902, 913 n.6 (7th Cir. 1997) ............................................ 13

*Money v. Johnson,*
    2016 U.S. Dist. LEXIS 70808 at \*9............................................... 12

*Riegel v. Medtronic, Inc.*
    552 U.S. 312, 128 S. Ct. 999 (2008)........................... 7, 8, 12, 13

*Stengel v. Medtronic, Inc.,*
    704 F.3d 1224 (9th Cir. 2013) ................................... 1, 8, 9, 10

*Wag More Dogs, LLC v. Cozart,*
    680 F.3d 359 (4th Cir. 2012) ........................................................ 6

*Warren v. Howmedica Osteonics Corporation*
    [Docket No. 4:10 CV 1346, 2011 WL 1226975 at \*4 (E.D.Mo. March 29, 2011) .................... 13

*Wright v. Stang Manufacturing Co.,*
    54 Cal. App. 4th 1218, 1235, 63 Cal. Rptr. 2d 422 (1997)..................... 9


**Statutes**
21 C.F.R. § 803.50(a)................................................................. 9, 10

21 U.S.C. § 360e(d)(2)..................................................................... 1

21 U.S.C. § 360e(d)(6)(A)(i) ........................................................... 8

21 U.S.C. § 360k(a) ................................................................ 6, 7, 8

Calif. Evid. Code § 669, subd. (a)(s) ......................................... 14

FRCP 12(b)(6) ....................................................................... 5, 14


**Other Authorities**
FDCA  515(b) ................................................................................ 1

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS;**
Case No. 2:16-cv-07316-DMG-KS

3

## I.    INTRODUCTION

Plaintiff Sara Ebrahimi ("Sara Ebrahimi"), by and through her attorneys, respectfully submits this memorandum of points and authorities in opposition to the motion to dismiss filed on behalf of Mentor. Ms. Ebrahimi's case is unlike previous cases filed against Mentor related to the Mentor MemoryGel™ Silicone Gel Breast Implants. Ms. Ebrahimi's claims focus on the defective manufacturing of the implants (as even Mentor will admit that the implants were not designed to leak or bleed), failure to warn of these defects, and Mentor's repeated failure to follow the requirements imposed by the Food and Drug Administration ("FDA").

Ms. Ebrahimi's complaints parallel, rather than add to, the FDA's requirements, and are therefore not preempted by federal law. In *Stengel v. Medtronic, Inc.*, 704 F.3d 1224 (9th Cir. 2013), the Ninth Circuit Court of Appeals made it clearer than ever that courts within the Ninth Circuit should take an expansive view of what constitutes a "parallel" claim. Mentor's Motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

Ms. Ebrahimi's Complaint contains the following allegations, all of which must be deemed true at the motion to dismiss stage:

### A.    PMA Approval

Mentor designed, manufactured, and distributed Mentor breast implants, including the Mentor MemoryGel Silicone Gel Breast Implants. *See* Compl. at ¶1. The FDA, after the enactment of the Medical Device Amendments ("MDA") to the Federal Food, Drug and Cosmetic Act ("FDCA"), allowed the use of silicone-filled breast implants as long as manufacturers later provided "reasonable assurance" of the products' safety and effectiveness. 21 U.S.C. §360e(d)(2); Compl. at ¶ 3 . In 1988, in response to emerging safety concerns, the FDA re-classified breast implants to class III devices (requiring premarket approval), which was finalized in 1991 when the FDA published a final 515(b) regulation allowing for PMAs for silicone gel-filled breast implants. *Id.*

In 1992, the FDA determined that there were insufficient data for approval, and Mentor's MemoryGel Silicone Gel Breast Implants were no longer marketed in the U.S., with the exception of use in reconstruction and revision patients. *Id.* at ¶ 5. In 2006, the FDA approved Mentor's

application for premarket approval ("PMA"). *Id.* at ¶ 6. As conditions of approval, Mentor was required to conduct six post-approval studies to further characterize the safety and effectiveness of their MemoryGel Silicone Gel Breast Implants and to answer scientific questions that the premarket clinical trials were not designed to answer. *Id.*

### B.    PMA-Mandated Studies

The FDA required Mentor to (1) continue and complete their **core post-approval study**, (2) conduct a **large post-approval study** to assess long-term outcomes and identify rare adverse events by enrolling 41,900 silicone gel-filled breast implant patients and 1,000 saline-filled breast implant patients and follow them for ten years, (3) conduct a **device-failure study** to evaluate how easily patients understand the information in the informed decision brochure about the risks associated with the use of silicone breast implants, (4) complete a **focus-group study** to evaluate how easily patients understand the information in the informed decision brochure about the risks associated with silicone breast implants, (5) complete an **informed decisions study** to monitor the process of how patient labeling is distributed to women considering silicone gel-filled breast implants, and (6) complete the **Mentor adjunct study**, which was in place after 1992, when the FDA allowed Mentor to market silicone gel-filled breast implants for reconstruction after mastectomy, correction of congenital deformities, or replacement of existing implants. *Id.* at ¶ 27.

Mentor failed to report adverse events from the six new or ongoing studies commissioned as part of implant's PMA approval, all of which would have led to reports suggesting the device's contribution to death or serious injury: (1) The core post-approval study showed a follow-up of only 59%, with reporting done only for six of the ten required years. *Id.* at ¶¶ 28-33. In the primary augmentation cohort, Mentor only reported the reasons for reoperation in 36% of the sample, with fully 47% of women in this cohort needing reoperation for which Mentor failed to document or explain the reasons. *Id.* (2) The large post-approval study only enrolled 41,451 patients, nearly 10,000 fewer than the PMA required. Of those patients, 113 did not provide important information. *Id.* at ¶¶ 34-7. By year seven, the overall follow-up rate for this study was only 20.1%. (*Id.*) (3) The device failure study did not list sample size, did not list results of the data findings (no clinical data and no visual inspection data), did not list safety findings, did not list any recommendations or

summary of safety and data or follow-up on the data, and did not list any changes to labeling, all in violation of this condition established in the PMA order. *Id.* at ¶¶ 38-40. (4) The focus group study used only 35 women in its study and subsequently ignored their recommendations for labeling changes. *Id.* at ¶¶ 41-44. (5) For the informed decision study, Mentor did not file a list of the sample size or the patients enrolled, and provided minimal information on the outcome. *Id.* at ¶¶ 45-6. (6) For the Mentor adjunct study, Mentor reported on only 36.8% of the patients in the reconstruction cohort, 49.7% of the patients in the revision-reconstruction cohort, and approximately 33% of the patients in the revision-augmentation cohort. *Id.* at ¶¶ 47-9.

### C.   Ms. Ebrahimi's Injuries

In 2013, Sara Ebrahimi consulted with a board-certified plastic surgeon in Encino, California to discuss breast augmentation. *Id.* at ¶ 17. She reviewed the Mentor brochure before consenting to the surgery and saw nothing in it to cause her any concern for her safety.  *Id.* In fact, the information related to her and the brochure confirmed for her that problems previously associated with silicone implants had been remedied before they were brought back on the market in 2006. *Id.* at ¶ 18.

On June 5, 2013, Ms. Ebrahimi underwent Bilateral Silicone Breast Augmentation in Encino, California and was implanted with Mentor MemoryGel Silicone Gel Breast Implants. *Id.* at ¶ 19. Prior to the surgery, Ms. Ebrahimi was a healthy and driven individual and lived a healthy lifestyle. *Id.* On June 12, 2013, Ms. Ebrahimi developed pain in both breasts along with mild hardening that persisted. *Id.* at ¶ 20. Several days later, on July 2, 2013, Ms. Ebrahimi developed an enlarged lymph node. *Id.* By August 2013, Ms. Ebrahimi had developed progressive severe pain in her left breast accompanied by lateral malposition. *Id.* She also experienced chest pain, pressure in her ribs, fatigue, increased pain in her lymph node, and weakness. *Id.*

On October 2, 2013, Ms. Ebrahimi underwent revision surgery on her left breast due to lateral malposition. *Id.* at ¶ 21. She was still experiencing pain in her ribs, swollen lymph nodes, and suffering from general fatigue and weakness. *Id.* In February 2014, bloodwork done on Ms. Ebrahimi showed high homocysteine (an amino acid linked to the development of stroke and heart disease) and high CRP (C-reactive protein, which is a substance produced by the liver in response

to inflammation). *Id.* at ¶ 22. By November 2014, she had developed photosensitivity with hives and itching after sun exposure, brittleness and cracking of her nails, easy bruising, shortness of breath, poor wound healing, and some lateral malposition of right breast. *Id.* Soon thereafter she developed cognitive difficulties and immune dysfunction. *Id.* Her fatigue and weakness had progressed to the point where she was often bedridden throughout the day. *Id.*

By June 2015, Ms. Ebrahimi began experiencing slow shrinkage of both breasts. *Id.* at ¶ 23. She had a metallic taste in her mouth, suffered from night sweats, headaches, foul body odor, cognitive dysfunction, nausea, and dizziness. *Id.* In July 2015, she was diagnosed with Lymphadenopathy, which is a swelling of the lymph nodes, indicative of infection. *Id.* An ultrasound procedure on the left side revealed extremely dense breast tissue. *Id.* Ms. Ebrahimi's symptoms continued to worsen, so she had more bloodwork done in January 2016. *Id.* at ¶ 24. The results revealed low white blood cells, increasing thyroid antibodies/autoimmune antibodies, EBV (Epstein—Barr virus, which is a type of herpes), CMV (Cytomegalovirus, another type of herpes), and varicella zoster (another type of herpes). *Id.* These results are indicative of a generalized weakened condition. *Id.* By February 7, 2016, Ms. Ebrahimi's chronic, incapacitating fatigue and illness forced her to move from Los Angeles to Seattle to live with her parents so that they could care for her. *Id.*

Throughout the first half of 2016, Ms. Ebrahimi's symptoms continued to worsen. *Id.* at ¶ 25. She also developed Hashimotos disease (an autoimmune disorder in which the immune system attacks the body's own tissues), skin rashes, and digestive and gastrointestinal issues. *Id.* New bloodwork in May 2016 showed high levels of homocysteine (increasing the risk of stroke and heart disease) and other abnormalities, all of which indicated a systemic toxicity due to her body fighting the implants. *Id.* As a result, her physician recommended removal of her implants. *Id.*

In July 2016, Ms. Ebrahimi underwent heavy metal testing and was found to have excessive levels of 10 different metals and detected levels of five different metals listed in Mentor's PMA Summary of Effectiveness, including arsenic, antimony, barium, cobalt, mercury, nickel, copper, zinc, chromium, titanium, vanadium, selenium, tin, and molybdenum. *Id.* at ¶ 26. She has been diagnosed with silicone toxicity, and strongly advised that it was medically necessary

to have the implants removed immediately. *Id*. Ms. Ebrahimi had her implants removed in October 2016. *Id*.

Mentor's Product Insert Data Sheet regarding the implants state that "[s]mall quantities of low molecular weight (LMW) silicone compounds, as well as platinum (in zero oxidation state), have been found to diffuse ("bleed") through an intact implant shell....Mentor performed a laboratory test to analyze the silicones and platinum (used in the manufacturing process), which may bleed out of intact MemoryGel Breast Implants into the body....Over 99% of the LMW silicones and platinum stayed in the implant. The overall body of available evidence supports that the extremely low level of gel bleed is of no clinical consequence." *Id*. at ¶ 54. The nature and extent of Ms. Ebrahimi's injuries and test results evidence a significant gel bleed, as opposed a bleed of "small quantities" of gel, or an "extremely low level of gel bleed." *Id*. at ¶ 55.

## III.  LEGAL ARGUMENT

The Complaint is based upon Defendant's repeated failure to follow the requirements imposed by the FDA, along with its defective manufacture of the implants, and Plaintiff's claims are not preempted by the MDA. Instead, the MDA explicitly provides for the very kind of parallel state law claims that Plaintiff alleges in her Complaint. First, there is no express preemption in the MDA that would prevent Plaintiff from bringing state law claims against Mentor for the manufacture of a defective device, so long as claims against a manufacturer parallel, rather than add to, the federal requirements. Second, Plaintiff's claims are based on state-law causes of action, not on a violation of federal law and therefore there is no implied preemption of Plaintiff's claims under *Buckman Co. v. Plaintiffs' Legal Comm*., 531 U.S. 341, 121 S. Ct. 1012 (2001). Third, Plaintiff's claims succeed on their merits once the preemption bar is cleared, since the Complaint adequately pleads all elements of its manufacturing defect, failure to warn, and negligence per se claims.

### A.  Legal Standard

In order to satisfy a challenge under Rule 12(b)(6), a complaint need only allege "enough facts to state a claim to relief that is plausible on its face" [*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973 (2007)], or sufficient facts to "raise a right to relief above the speculative level."  *Id*. at 555; see also *Meyers v. Lance*, Case No. 4:12-cv-215 (CDL), 2012 U.S. Dist. LEXIS

175537, *1-2 (M.D. Ga. Dec. 12, 2012) (*Twombly* "did not suggest that the Supreme Court intended to rewrite Rule 12(b)(6) or abandon notice pleading; and the Court's observation that 'a formulaic recitation of the elements of a cause of action' does not suffice, did not seem to foreshadow a sea-change in the legal standard governing motions to dismiss.") (citations omitted).

"[O]nly the legal sufficiency of the complaint, and not the facts in support of it, are tested under a Rule 12(b)(6) motion." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.*, 213 F.3d 175, 180 (4th Cir. 2000). Accordingly, the Court must "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Id*. A plaintiff may "establish 'facial plausibility' by pleading 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)).

A well-pled complaint may not be dismissed even if "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

## B.   Parallel State Claims Are Not Preempted By Federal Law

Ms. Ebrahimi's claims survive a preemption analysis because the claims are based on traditional state-law tort claims that are not meant to enforce the MDA. Contrary to Defendant's claims, a lawsuit that challenges the safety and effectiveness of a Class III medical device should be permitted as long as the claims therein are not different from, or in addition to, the federal requirements. This is the rule stated in 21 U.S.C. § 360k(a).

The Supreme Court has heard three cases involving preemption of the MDA, all of which established that state law tort claims, as long as they are not different from or in addition to federal requirements, will not be preempted by the MDA. In the first, *Medtronic, Inc. v. Lohr* [518 U.S. 470, 116 S. Ct. 2240 (1996)], the court reversed dismissal of certain Florida state tort claims against the manufacturer of a pacemaker, a Class III device including allegations that the defendant failed to provide adequate warnings of potential risks. Justice Stevens noted: "Medtronic's argument is not only unpersuasive, it is implausible. Under Medtronic's view of the statute, Congress effectively

precluded state courts from affording state consumers any protection resulting from a defective medical device." *Id.* At 487.  He concluded that the defendant's interpretation of §360k would "have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order to 'to provide for the safety and effectiveness of medical devices intended for human use.'" *Id.* at 487.

In the second case, *Buckman Co. v. Plaintiffs' Legal Comm., supra*, the court reviewed a state-law tort claim brought against a consultant to a screw manufacturer which assisted the manufacturer in obtaining FDA approval for the use of the screws in spinal surgeries, making the screws a Class III medical device. In finding implied preemption for the plaintiff's "fraud on the FDA claim" the Court distinguished its holding from *Lohr* by noting that the *Buckman* plaintiffs did not claim any state law causes of action in their Complaint. *Id.* at 348. Instead, the *Buckman* plaintiffs were concerned with an alleged fraud on the FDA during the approval process which, the court noted, presented a "uniquely federal" issue. *Id.*

In contrast, Ms. Ebrahimi is not claiming that Mentor committed fraud in obtaining its premarket approval.  Rather, she bases her state tort claims on the failure of Mentor to comply with the conditions imposed on it by the FDA to continue to monitor the use of its product to determine the effectiveness and safety and to report to the FDA any findings adverse to the products safety. Her tort claims would be cognizable in the absence of the MDA but do not seek to impose burdens on Mentor in addition to those required by the pre-market approval.

The third case interpreting §360k, *Riegel v. Medtronic, Inc.* [552 U.S. 312, 128 S. Ct. 999 (2008)], is discussed at length in Mentor's Motion to Dismiss. In *Riegel,* plaintiffs sued over the failure of Medtronic's balloon catheter which was being inserted into plaintiff artery to dilate the artery which had become heavily calcified.  The court noted that the catheter had received premarket approval from the FDA and, therefore could not be altered in design specifications, manufacturing processes, labelling, or effectiveness without FDA permission. 21 USC § 360e(d)(6)(A)(i). According to the labelling approved by the FDA the catheter should not be inflated beyond its rated burst pressure of eight atmospheres.

Riegel's physician, after inserting the catheter, inflated it five times to a pressure of 10 atmospheres, causing it to burst, resulting in the necessity for Mr. Riegel to undergo emergency bypass surgery.  Riegel' state court claims alleged that the catheter was designed, labeled and manufactured in a manner that violated New York common law. The court held that Riegel's state law based claims were preempted because those claims would have imposed on the manufacturer a greater burden than imposed by the FDA approval process.  Stated another way, Riegel sought to impose a standard on Medtronic **in addition to** that imposed by the federal regulatory authority. While the court found express preemption it noted that the decision was   consistent with *Lohr*'s holding that state law claims **parallel to** federal law would not be preempted. *Id.* at 330.

This group of preemption cases has been held by several circuits, including the Ninth, to stand for the proposition that state tort law claims, provided they meet the requirement under §360k not to add to or differ from federal requirements, will not be preempted under the MDA. The Seventh Circuit, in a case holding that the failure of a Class III medical device was not preempted by the MDA, wrote, "The idea that Congress would have granted civil immunity to medical device manufacturers for their violation of federal law that hurt patients is, to say the least, counter-intuitive." *Bausch v. Stryker Corp.,* 630 F.3d 546, 549 (7th Cir. 2010). The Ninth Circuit has made it clear that an expansive view should be taken on what constitutes a parallel claim for the purposes of avoiding preemption.

*Stengel* is the latest treatment of the issue.  An *en banc* decision by the Ninth Circuit, which controls the decision before this Court, the Court held, under *Lohr*, *Buckman*, and *Riegel*, that a failure to warn claim brought for injuries related to a PMA-approved, Class III medical device was not expressly or impliedly preempted by the MDA.  Plaintiff, had a Medtronic pump implanted in his abdomen to deliver pain medication to his spine.  The device malfunctioned resulting in permanent paralysis.  The risks of the potential malfunction were unknown to Medtronic at the time of the PMA however, after that and before the device was implanted in Mr. Stengel, it learned of those risks but failed to report them to the FDA as required in the pre-market approval.  The *Stengel* court, began its discussion by noting: "In all preemption cases, and particularly those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' we 'start with

the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic*, supra at 485; *Stengel*, supra at 1228.

*Stengel* thus holds that there is no federal preemption under the MDA for a claim that a medical device manufacturer has failed in its "continuing duty to monitor the product after the pre-market approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that may be attributable to the product." *Stengel*, at 1232-33. A failure to warn the FDA constitutes a violation of the FDA's own regulations, which require a manufacturer to file an Adverse Event Report if it learns of information "reasonably suggest[ing] that one of its devices 'may have caused or contributed to death or serious injury.'" *Id.* at 1234 (concurring opinion). The court stated further that plaintiff, in using state law, "seeks to hold [the manufacturer] accountable only for failing to do what federal law mandated—nothing more." Therefore, the state law violations alleged there are "precisely parallel to the duties imposed by federal law." *Id.*

As with Arizona law, which was the state law at issue in *Stengel*, California law creates a duty to warn parallel to 21 C.F.R. § 803.50(a), as a device manufacturer can be found liable if it "did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." *Anderson v. Owens-Corning Fiberglass Corp.,* 53 Cal. 3d 987, 1002, 281 Cal. Rptr. 528, 537, 810 P.2d 549, 558 (1991). A manufacturer owes a foreseeable user of its product a duty to warn of risks of using the product. *Wright v. Stang Manufacturing Co.,* 54 Cal. App. 4th 1218, 1235, 63 Cal. Rptr. 2d 422, 433 (1997).

### 1.    Mentor Failed to Report Adverse Effects to the FDA

Similar to the pleadings at issues in *Stengel*, 704 F.3 at 1233, Ms. Ebrahimi's Complaint alleges a violation of FDA regulations or requirements related to the device, predicated on Mentor's failure to report adverse information about its product to the FDA after FDA approval. The FDA has regulations in place requiring the manufacturer to report any information that reasonably suggests that the device (1) may have caused or contributed to a death or serious injury or (2) has

malfunctioned and that any recurring malfunction would be likely to cause or contribute to a death or serious injury. 21 C.F.R. § 803.50(a); *Stengel*, 704 F.3d at 1226-7. Furthermore, the PMA itself imposed requirements in the form of six follow-up studies, described above.

Ms. Ebrahimi has alleged in her Complaint that Mentor failed to report adverse events from the six new or ongoing studies commissioned as part of implant's PMA approval, all of which would have led to reports suggesting the device's contribution to death or serious injury: (1) The Core Post-Approval Study showed a follow-up of only 59%, with reporting done only for six of the ten required years. (Compl. at ¶¶ 28-33.) In the primary augmentation cohort, Mentor only reported the reasons for reoperation in 36% of the sample, with fully 47% of women in this cohort needing reoperation for which Mentor failed to document or explain the reasons. (*Id*.) (2) The Large Post-Approval Study only enrolled 41,451 patients, nearly 10,000 fewer than the PMA required. Of those patients, 113 did not provide important information. (Compl. at ¶¶ 34-7.) By year seven, the overall follow-up rate for this study was only 20.1%. (*Id*.) (3) The Device Failure Study did not list sample size, did not list results of the data findings (no clinical data and no visual inspection data), did not list safety findings, did not list any recommendations or summary of safety and data or follow-up on the data, and did not list any changes to labeling, all in violation of this condition established in the PMA order. (Compl. at ¶¶ 38-40.) (4) The Focus Group Study used only 35 women in its study and subsequently ignored their recommendations for labeling changes. (Compl. at ¶¶ 41-44.) (5) For the Informed Decision Study, Mentor did not file a list of the sample size or the patients enrolled, and provided minimal information on the outcome. (Compl. at ¶¶ 45-6.) (6) For the Mentor Adjunct Study, Mentor reported on only 36.8% of the patients in the reconstruction cohort, 49.7% of the patients in the revision-reconstruction cohort, and approximately 33% of the patients in the revision-augmentation cohort. (Compl. at ¶¶ 47-9.)

These results demonstrate a continual violation of the requirements issued by the FDA. Because of poor follow-up or obfuscation of the data, information was not given to the FDA that would have disclosed the product's propensity to cause serious injury to the ultimate user. Plaintiff has not alleged any violation of reporting requirements that is different from or in addition to what was required in the PMA.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS;**
Case No. 2:16-cv-07316-DMG-KS

### 2. Plaintiff Establishes a Casual Nexus Between Alleged Injury and Violation

In order to make a cognizable failure to warn claim to survive preemption, the plaintiff is also required to establish a causal nexus between the alleged injuries and the alleged violations. *Eidson v. Medtronic, Inc.,* 40 F. Supp. 3d 1202 (N.D. Cal. 2014). In *Eidson*, the court originally deemed the pleadings deficient because in terms of causation because it was alleged that defendant failed to report only a single adverse event, and plaintiff did not provide a date when this failure to report occurred. *Id.* at 1233. However, upon curing this deficiency, the court determined that plaintiffs had included studies to show an underreporting of adverse events on a large scale and that, if not for defendants' failure to report those studies, plaintiffs' surgeons would have had access to that adverse data. *Id.* at 1234. Therefore, a causal nexus had been established between the alleged injury and violation.

Similar to *Eidson*, Ms. Ebrahimi has provided multiple occasions when Defendant failed to report adverse events to the FDA, all predating the Plaintiff's 2013 implant surgery. All six of the studies described above were supposed to support long-term safety, but the poor follow-up rates and inadequate data confirm Mentor's systematic failure to follow FDA requirements. (Compl. at ¶ 51.) Halfway through the ten-year prospective post-marketing studies mandated by the FDA, well over half of the 80,000 women in the study groups were dropped or otherwise eliminated from the studies. Most violations of the PMA occurred prior to her date of surgery. (*Id.*) Of the patients who were accounted for, significant numbers reported systemic ailments which can only be attributed to gel bleed introducing known toxins including metals and chemicals into their bodies. (*Id.*) Mentor was aware, or should have been aware that the gel contained chemicals and metals toxic to the human body but failed to adequately report that to the FDA and warn their patients of the dangerous consequences of them. (*Id.*) The risk of a significant gel bleed was not disclosed or discussed in what Mentor calls its "Directions for Use" or in its consumer labeling, despite the availability of substantial evidence that such was a significant potential risk of use, even in a properly manufactured product, was present. If not for Mentor's failure to provide the PMA-required follow-up data, Plaintiff would not have been implanted with a defective device in 2013.

The voluminous allegations of Mentor's failure to provide the required follow-up data from multiple PMA-dictated studies, along with the showing in the Complaint that much of this failure occurred prior to Ms. Ebrahimi's implant surgery, is enough to survive a motion to dismiss. (Compl. at ¶ 57.)

Having shown that a failure to conduct follow-up studies and/or pass along the results of these studies to the FDA violated the PMA, and that this failure directly led to the injuries alleged in the Complaint, Ms. Ebrahimi has stated a failure to warn cause of action that survives express preemption. This claim has been made in California state tort law, parallel to the claim that Mentor violated federal regulations under the PMA.

### 3.    Manufacturing Defect Claim Is Not Expressly Preempted

Under California law, a manufacturing defect "is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." *Barker v. Lull Eng'g Co*., 20 Cal. 3d 413, 429, 143 Cal. Rptr. 225, 235, 573 P.2d 443, 453 (1978). Claims for manufacturing defect must show that a suitable design was in place, but that the manufacturing process in some way deviated from the design. *Money v. Johnson*, 2016 U.S. Dist. LEXIS 70808 at *9. A defective manufacturing claim is not preempted insofar as it alleges that the manufacturing of the device both fell short of the FDA's requirements for manufacturing and—based on the same deficiency—was defectively manufactured under California law. *Funke v. Sorin Grp. USA, Inc.,* 147 F. Supp. 3d 1017, 1027 (C.D. Cal. 2015).

In *Hofts v. Howmedica Osteonics Corp.,* 597 F. Supp. 2d 830 (S.D. Ind. 2009), the United States District Court concluded, upon analyzing *Riegel*, that manufacturing defect claims were not preempted by the MDA. The court explained that the Plaintiff was basing claims on allegations that the manufacturer failed to meet the FDA's requirements and not anything else, and that a jury "could find that [the manufacturer] breached the duty of care it owed … by failing to adhere to … manufacturing requirements without imposing different or additional requirements." Similarly, in *Warren v. Howmedica Osteonics Corporation* [Docket No. 4:10 CV 1346, 2011 WL 1226975 at *4 (E.D.Mo. March 29, 2011)] the District Court concluded that the plaintiffs' manufacturing defect

claims survived preemption[1] and in *Bausch v. Stryker Corporation*, the District Court concluded that manufacturing defect claims that parallel the FDA's requirements remain viable even after *Riegel*.[2]

Ms. Ebrahimi's manufacturing defect claim survives preemption for the same reason as her failure to warn claim. The MDA does not expressly preempt these state-law manufacturing defect claims because they are neither different from nor in addition to the requirements specific in the PMA. Ms. Ebrahimi alleges that the PMA includes specifications with respect to the manufacture of the implant. (Compl. at ¶81.) The Complaint further alleges that the FDA also has Quality System Regulations and Current Good Manufacturing Practices in place that required Mentor to test products for compliance with specifications, to document and check compliance before they were placed on the market, and to identify all products that failed to conform with product specifications. (*Id*.)

The product implanted in Ms. Ebrahimi's body was one that differed from the manufacturer's intended result. (Compl. at ¶81.) Specifically, the silicone gel bleed through the shell of the implant used in her surgery, due to its porous or weak structure, was inconsistent with the specifications submitted to the FDA for PMA approval, and inconsistent with the FDA's regulations and practices. (Compl. at ¶80.) The Complaint further alleges that a causal nexus existed between these defects and the injuries suffered by Ms. Ebrahimi. (Compl. at ¶¶ 84-5.)

It is clear from the allegations in the Complaint that Plaintiff's state law claims are parallel to the MDA requirements and thus not preempted by the MDA.

---

[1] See *Warren v. Howmedica Osteonics Corporation*, Docket No. 4:10 CV 1346, 2011 WL 1226975 at *4 (E.D.Mo. March 29, 2011); accord *Burgos v. Satiety, Inc.*, Docket No. 10-CV-2680, 2011 WL 1327684 at *2 (E.D.N.Y. April 5, 2011)
[2] See *Bausch v. Stryker Corp.*, 630 F.3d 546, 552 (7th Cir. 2010); see also *Chambers v. Osteonics Corp.*, 109 F.3d 1243, 1248 (7th Cir. 1997) (holding that the MDA did not preempt a state-law manufacturing defect claim); *Mitchell v. Collagen Corp.*, 126 F.3d 902, 913 n.6 (7th Cir. 1997) (observing that state-law negligence claims not preempted if they are based on claims that manufacturer did not adhere to FDA standards in the premarket approval process)

C. **Negligence Per Se**

California recognizes the applicability of negligence per se in a broad range of scenarios, including violation of the FDCA. *Dirosa v. Showa Denko K.K.*, 44 Cal. App. 4th 799, 808, 52 Cal. Rptr. 2d 128, 133 (1996). A federal standard in the Act has been adopted as the standard of care in a negligence action. *Id.* A claim may be brought in state court for negligence per se as long as the injury results from "an occurrence of the nature which the… regulation was designed to prevent" and the person suffering the injury "was one of the class of persons for whose protection the… regulation was adopted." *Calif. Evid. Code* § 669, subd. (a)(s).

Here, Plaintiff alleges violation of the FDA's regulations to limit risk inherent in class III medical devices, and, as a recipient of one of those devices, the Plaintiff is in the class of persons the regulations are meant to protect. Both of the claims made in the complaint are cognizable claims under California state tort law, and both parallel the federal requirements.

**IV. CONCLUSION**

Based on the above, Plaintiff Sara Ebrahimi respectfully requests that the Court enter an order denying Defendant's Rule 12(b)(6) Motion to Dismiss. Alternatively, Plaintiff requests leave to amend her Complaint.

Dated: January 20, 2017        **COTCHETT, PITRE & McCARTHY, LLP**

By: * /s/ Neda L. Lofti     *
            ROBERT B. HUTCHINSON
            NEDA L. LOTFI
            JOEL M. GORDON

            *Attorneys for Plaintiffs*

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS;**
Case No. 2:16-cv-07316-DMG-KS