JOSEPH W. COTCHETT (36324)
jcotchett@cpmlegal.com
ROBERT B. HUTCHINSON (45367)
rhutchinson@cpmlegal.com
NEDA L. LOTFI (290213)
nlotfi@cpmlegal.com
JOEL M. GORDON (SBN 280721)
jgordon@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Boulevard, Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008
Facsimile: (310) 392-0111

*Counsel for Plaintiff Sara Ebrahimi*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SARA EBRAHIMI, an individual,**<br><br>Plaintiff,<br><br>v.<br><br>**MENTOR WORLDWIDE LLC; JOHNSON & JOHNSON SERVICES, INC;**<br><br>Defendants. | Case No. 2:16-cv-07316-DMG-KS<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1) STRICT PRODUCT LIABILITY [FAILURE TO WARN]**<br><br>**2) STRICT PRODUCT LIABILITY [MANUFACTURING DEFECT]**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Law Offices
Cotchett, Pitre &
McCarthy, LLP

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

**TABLE OF CONTENTS**

**Page**

I.     NATURE OF THE ACTION..................................................................................1

II.    PARTIES ............................................................................................................2

       A.     Plaintiff Sara Ebrahimi ...........................................................................2

       B.     Defendant Mentor ...................................................................................3

III.   JURISDICTION AND VENUE ...........................................................................3

IV.    FACTUAL ALLEGATIONS ...............................................................................3

       A.     Silicone Implants—Background .............................................................3

       B.     Sara Ebrahimi Background ......................................................................4

       C.     Mentor PMA Approval ...........................................................................6

              i.    Core Post-Approval Study ...........................................................7
              ii.   Large Post-Approval Study .........................................................8
              iii.  Device Failure Study ...................................................................9
              iv.   Focus Group Study ....................................................................10
              v.    Informed Decision Study ...........................................................11
              vi.   Mentor Adjunct Study ...............................................................11

       D.     Mentor Violated the PMA Conditions..................................................12

       E.     Mentor Intentionally Failed to Warn Patients and Doctors .................14

V.     VIOLATIONS ALLEGED .................................................................................15

       FIRST CAUSE OF ACTION ............................................................................15

       Strict Product Liability—Failure To Warn .......................................................15

       SECOND CAUSE OF ACTION .......................................................................17

       Strict Product Liability—Manufacturing Defect ..............................................17

PRAYER FOR RELIEF...............................................................................................18

DEMAND FOR JURY TRIAL....................................................................................19

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

1       Plaintiff Sara Ebrahimi ("Sara Ebrahimi"), by and through her attorneys, based on

2 information and belief, alleges against Defendant Mentor Worldwide LLC ("**Mentor**").

3 **I.    NATURE OF THE ACTION**

4       1.    Sara Ebrahimi brings this action against Defendant, based on its defective

5 manufacturing of Mentor MemoryGel™ Silicone Gel Breast Implants, repeated failure to follow

6 the requirements imposed by the Food and Drug Administration ("FDA") in connection with

7 approval of Mentor's premarket approval application (PMA), and failure to warn the FDA and

8 ultimate users of known dangerous propensities.

9       2.    Founded in 1969, Mentor is a leading supplier of medical products for the global

10 aesthetic market. The company develops, manufactures, and markets, science-based products for

11 surgical and non-surgical medical procedures that allow patients to improve their quality of life.

12 The company is focused on three strategic areas: breast, body and facial aesthetics and is the only

13 manufacturer whose breast implants are made in the U.S.A. Mentor joined the Johnson &

14 Johnson Family of Companies in 2009 and is part of its Global Surgery Group.

15       3.    In 1976, Congress passed the Medical Device Amendments ("MDA") to the

16 Federal Food, Drug and Cosmetic ("FD&C) Act. Breast implants were placed into Class II

17 devices and reviewed through the premarket notification [510(k)] process. In 1988, in response

18 to emerging safety concerns, the FDA re-classified breast implants to class III devices (requiring

19 premarket approval), which was finalized in 1991 when the FDA published a final 515(b)

20 regulation calling for new silicone gel-filled breast implant applications for premarket approval.

21       4.    Premarket approval (PMA) is the FDA process of scientific and regulatory review

22 to evaluate the safety and effectiveness of Class III medical devices. Class III devices are those

23 that support or sustain human life, are of substantial importance in preventing impairment of

24 human health, or which present a potential, unreasonable risk of illness or injury. Due to the level

25 of risk associated with Class III devices, the FDA has determined that general and special

26 controls alone are insufficient to assure the safety and effectiveness of class III devices.

27 Therefore, these devices require a PMA under section 515 of the FD&C Act in order to obtain

28 marketing clearance.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**FIRST AMENDED COMPLAINT AND JURY DEMAND**          1

5.     In January 1992, the FDA announced a voluntary moratorium on silicone gel-filled breast implants, requesting that manufacturers stop supplying them and surgeons stop implanting them, while the FDA reviewed new safety and effectiveness information that had been submitted. In April 1992, the FDA determined that none of the PMAs submitted for Mentor's MemoryGel Silicone Gel Breast Implants contained sufficient data to support approval, and therefore, Mentor's MemoryGel Silicone Gel Breast Implants were no longer marketed in the U.S. However, the FDA also determined that access to silicone gel-filled breast implants for reconstruction and revision patients should continue, and implants used for these indications should be considered to be investigational devices, and women who received them should be followed through adjunct clinical studies.

6.     In December 2003, Mentor Worldwide LLC ("Mentor") submitted a PMA for its MemoryGel Silicone Gel Breast Implants. In 2006, the FDA approved Mentor's PMA. Exhibit 1. This was the first time silicone gel-filled breast implants were available for augmentation, in addition to reconstruction and revision, since the moratorium was established in 1992. As conditions of approval, Mentor was required to conduct six post-approval studies to further characterize the safety and effectiveness of their MemoryGel Silicone Gel Breast Implants and to answer scientific questions that the premarket clinical trials were not designed to answer.

## II.     PARTIES

### A.     Plaintiff Sara Ebrahimi

7.     Plaintiff, Sara Ebrahimi ("Plaintiff" or "Ms. Ebrahimi"), is a resident of Bellevue, Washington.

///

///

///

**B.** <u>Defendant Mentor</u>





8.     Defendant Mentor is a limited liability company incorporated under the laws of Delaware with its principal place of business located at 201 Mentor Drive, Santa Barbara, CA, and its headquarters located at 33 Technology Drive, Irvine, CA 92618.  Defendant Mentor is a wholly-owned subsidiary of Defendant Johnson & Johnson.

**III.   <u>JURISDICTION AND VENUE</u>**

9.     This court has subject matter jurisdiction based on diversity of the parties and the amount in controversy exceeds $75,000.00 as required under 28 U.S.C. § 1331.

10.     Venue is appropriately in the Central District of California pursuant to 28 U.S.C. § 1391(a), in that: (a) Defendant Mentor has its principle place of business in California; and (b) a substantial part of the events giving rise to this action occurred in this District.

**IV.   <u>FACTUAL ALLEGATIONS</u>**

**A.     <u>Silicone Implants—Background</u>**

11.     At all relevant times, Mentor designed, manufactured, and distributed Mentor breast implants, including the Mentor MemoryGel Silicone Gel Breast Implants.

12.     The FDA, after the enactment of the MDA, allowed the use of silicone-filled breast implants as long as manufacturers later provided "reasonable assurance" of the products' safety and effectiveness. 21 U.S.C. §360e(d)(2). In 1988, in response to emerging safety concerns, the

1   FDA re-classified breast implants to class III devices (requiring premarket approval), which was

2   finalized in 1991 when the FDA published a final 515(b) regulation allowing for PMAs for

3   silicone gel-filled breast implants.

4        13.   In 1992, the FDA determined that there were insufficient data for approval, and

5   Mentor's MemoryGel Silicone Gel Breast Implants were no longer marketed in the U.S., with

6   the exception of use in reconstruction and revision patients. In 2006, the FDA approved Mentor's

7   PMA. Exhibit 1. As conditions of approval, Mentor was required to conduct six post-approval

8   studies to further characterize the safety and effectiveness of their MemoryGel Silicone Gel

9   Breast Implants and to answer long term questions that the premarket clinical trials were not

10   designed to answer.

11   **B.   Sara Ebrahimi Background**

12        14.   In 2013, Sara Ebrahimi consulted with a board-certified plastic surgeon in Encino,

13   California to discuss breast augmentation. She reviewed the Mentor brochure (Exhibit 2) before

14   consenting to the surgery.

15        15.   In fact, the information related to her and the brochure confirmed for her that

16   problems previously associated with silicone implants had been remedied before they were

17   brought back on the market in 2006.

18        16.   On June 5, 2013, Ms. Ebrahimi underwent Bilateral Silicone Breast Augmentation

19   in Encino, California and was implanted with Mentor MemoryGel Silicone Gel Breast Implants.

20   Prior to the surgery, Ms. Ebrahimi was a healthy and driven individual and lived a healthy

21   lifestyle.

22        17.   On June 12, 2013, Ms. Ebrahimi developed pain in both breasts along with mild

23   hardening that persisted. Several days later, on July 2, 2013, Ms. Ebrahimi developed an enlarged

24   lymph node. By August 2013, Ms. Ebrahimi had developed progressive severe pain in her left

25   breast accompanied by lateral malposition. She also experienced chest pain, pressure in her ribs,

26   fatigue, increased pain in her lymph nodes, and weakness.

27

28

18.     On October 2, 2013, Ms. Ebrahimi underwent revision surgery on her left breast due to lateral malposition. She was still experiencing pain in her ribs, swollen lymph nodes, and suffering from general fatigue and weakness.

19.     In February 2014, bloodwork done on Ms. Ebrahimi showed high homocysteine (an amino acid linked to the development of stroke and heart disease) and a moderate level of CRP (C-reactive protein, which is a substance produced by the liver in response to inflammation.). By November 2014, she had developed photosensitivity with hives and itching after sun exposure, brittleness and cracking of her nails, easy bruising, shortness of breath, poor wound healing, and some lateral malposition of right breast. Soon thereafter she developed cognitive difficulties and immune dysfunction. Her fatigue and weakness had progressed to the point where she was often bedridden throughout the day.

20.     By June 2015, Ms. Ebrahimi began experiencing slow shrinkage of both breasts. She had a metallic taste in her mouth, suffered from night sweats, headaches, foul body odor, cognitive dysfunction, nausea, and dizziness. In July 2015, she was diagnosed with Lymphadenopathy, which is a swelling of the lymph nodes, indicative of infection. An ultrasound procedure on the left side revealed extremely dense breast tissue.

21.     Ms. Ebrahimi's symptoms continued to worsen, so she had more bloodwork done in January 2016. The results revealed low white blood cells, increasing thyroid antibodies/autoimmune antibodies, EBV (Epstein—Barr virus), CMV (Cytomegalovirus,), and varicella zoster (a virus). These results are indicative of a generalized weakened condition. By February 7, 2016, Ms. Ebrahimi's chronic, incapacitating fatigue and illness forced her to move from Los Angeles to Bellevue to live with her parents so that they could care for her.

22.     Throughout the first half of 2016, Ms. Ebrahimi's symptoms continued to worsen. She also developed Hashimotos disease (an autoimmune disorder in which the immune system attacks the body's own tissues), skin rashes, and digestive and gastrointestinal issues. New bloodwork in May 2016 showed high levels of homocysteine (increasing the risk of stroke and heart disease) and other abnormalities, all of which indicated a systemic toxicity due to her

body's reaction to the toxic elements contained within the gel of the implants. As a result, her physician recommended removal of her implants.

23.    In July 2016, Ms. Ebrahimi underwent heavy metal testing and was found to have high or excessive levels of 10 different metals listed in Mentor's PMA Summary of Effectiveness, including: antimony, barium, chromium, copper, mercury, molybdenum, nickel, titanium, vanadium and zinc.  The test revealed the presence of 5 of the other metals listed Mentor's application for premarket approval. She was diagnosed with silicone toxicity, and strongly advised that it was medically necessary to have the implants removed immediately.

24.    On November 26, 2016, Ms. Ebrahimi underwent explantation surgery with Dr. H. Jae Chun, and her implants and capsules were sent to a laboratory to be analyzed by Dr. P. Blais.

25.    Dr. Blais made the following *preliminary findings*: (1) capsular contracture, a response of the immune system to toxic materials, which develops when internal scar tissue forms a tight or constricting capsule around a breast implant, contracting it until it becomes misshapen and hard; (2) poor quality of workmanship and patch defects; (3) shell failure, as the shell failed to confine the gel which contained metals; and (4) evidence of intracapsular bleeding.

26.    After the implants were removed, Ms. Ebrahimi gradually began to regain her health with respect to most of the symptoms she had been experiencing.

## C.    Mentor PMA Approval

27.    On November 17, 2006, the FDA approved Mentor's PMA, which allowed Mentor to market its MemoryGel Silicone Gel Breast Implants, conditioned upon six requirements. The FDA required Mentor to (1) Continue and complete their **core post-approval study,** (2) Conduct a **large post-approval study** to assess long-term outcomes and identify rare adverse events by enrolling 41,900 silicone gel-filled breast implant patients and 1,000 saline-filled breast implant patients and follow them for 10 years, (3) Conduct a **device-failure study** in concert with their large post-approval study to further identify the modes and causes of failure of explanted devices over the 10-year period, (4) Complete a **focus-group study** to evaluate how easily patients understand the information in the informed decision brochure about the risks associated with the

use of silicone breast implants, (5) Complete an **informed decision study** to monitor the process of how patient labeling is distributed to women considering silicone gel-filled breast implants, and (6) Complete the Mentor **adjunct study**, which was in place after 1992, when the FDA allowed Mentor to market silicone gel-filled breast implants for reconstruction after mastectomy, correction of congenital deformities, or replacement of existing implants. Women who received silicone gel-filled breast implants for these purposes were enrolled in Adjunct Studies so that data about device performance and safety could be collected. Participant enrollment began in 1992 for Mentor. As a condition of approval of silicone gel-filled breast implants in 2006, Mentor was required to close enrollment of new patients into the Adjunct Studies but continue to follow existing participants through their 5-year post-implant evaluations

i.   **Core Post-Approval Study**

28.   As one of the conditions of approval, the FDA specifically required Mentor to continue their Core Study, which had been underway and published in Mentor's PMA. Exhibit 3. There were 1008 patients enrolled in that study. Mentor was to continue the study until all patients had completed their 10-year evaluation in order to assess the long-term clinical performance of their product. Mentor was required to collect data via annual physician follow-up evaluations. The primary changes to the protocol from premarket to post approval were that all non-MRI patients should have an MRI at years 6, 8, and 10 and that all patients who were explanted without replacement were to be evaluated through 10 years. Mentor was also required to update their patient and physician labeling to reflect the results of the 5 and 10-year Core Study findings and to report to the FDA significant new information regardless of when the information became available.

29.   According to the FDA website, the core post-approval study follow-up rates at nine years post-implant were only 59 percent. The lack of a sufficient statistical sample, due to the low follow-up rate, hampered Mentor's ability to alter the labeling and defeated the purpose of the study in assessing the long-term clinical performance of the product. Furthermore, the FDA requirements specifically mandated evaluation through 10 years, but the report schedule illustrates that reporting was only done for six years. The reported findings of this study lack

statistical reliability in the sub-groups (cohorts): primary augmentation, revision augmentation, primary construction, and revision reconstruction.

30.     In the primary augmentation cohort, Mentor only reported the reasons for reoperation in 36% of the sample. Mentor failed to disclose to the FDA the reasons why only about one-third of the sample were included in this aspect of the study.

31.     In the revision augmentation cohort, reoperation rate was 43%. Mentor reported the most common reason for reoperation, which was capsular contraction, at 30.4%. Mentor failed to disclose other significant reasons why women in this category needed reoperation.

32.     In the primary construction cohort, Mentor reported reoperation rates at 49%. Mentor reported that of that group, 53% needed reoperation because of asymmetry, capsular contraction, rupture, and breast mass. Fully 47% of women in this category needed reoperation for which Mentor failed to document or explain the reasons.

33.     In the revision reconstruction cohort, reoperation was performed on 50.7% of the women surveyed. The most frequently reported reasons were capsular contraction and breast mass totaling 36% of reoperations. Other reported reasons, including connective tissue and neurologic disorders and gel bleed were downplayed even though they were significant given the small sample studied.

### ii.     Large Post-Approval Study

34.     The FDA's approval also required Mentor to conduct a 10-year large post approval study, consistent with a protocol submitted to the FDA by Mentor on September 26, 2006. Exhibit 4.

35.     That protocol required patient enrollment within 90 days of issuance of the PMA. The Large Post-Approval Study was to be a separate study from the Core Study and was to include 41,900 Mentor silicone gel patients and 1,000 saline-filled breast implant patients as the control group. The purpose of this study was to address specific issues for which the Core Study was not designed to fully answer, including a real-world assessment of long-term local complications, such as connective tissue disease (CTD), CTD signs and symptoms, neurological disease, neurological signs and symptoms; offspring, reproductive, and lactation issues; cancer

rates, suicide, mammography issues, rupture results, and MRI compliance. The data was to be collected through annual patient questionnaires, either completed via the internet, mail, or telephone. The study also required physician evaluations at years 1, 4-6, 9 and 10 to collect data on complications. Mentor was required to update their patient and physician labeling to reflect the 5 and 10-year study findings, as well as at any other time if necessary to report significantly new information from the study.

36.   At the outset, the actual number of enrolled patients was 41, 451, over 500 patients fewer than the PMA requirements. Of those patients, 113 did not provide important information. At year 7, the overall follow-up rate was 20.1% (8,331 participants out of 41,452), leaving 79.9% of the desired statistics unavailable for evaluation.

37.   This was a study of significant importance required by the FDA for post market approval. The study was designed to address a critical spectrum of health issues for women with breast implants. Mentor did not comply with the required data collection. With a 79% dropout rate, the study failed to demonstrate that use of the Mentor silicone gel implants was safe. The inadequate results are even more disconcerting because the data collection was designed to examine reasons for reoperation—previously unevaluated—including MRI results, and rheumatologic or neurological symptoms. The lack of participation and reliable results from this study show that Mentor has failed to comply with FDA requirements. Mentor did not follow through with data collection, only 21% were followed up on after three years, leaving 79% not followed up on for the 3-year data collection. 79.9% were not followed up on for the 7-year data collection, and no follow-up rate was provided for the 10-year data collection.

### iii.   **Device Failure Study**

38.   In order to ascertain the reasons for and frequency of device failure, the FDA specifically required that "Mentor must continue preclinical studies to characterize the long-term modes and causes of failure of explanted retrieved devices for the 10-year duration of the large postapproval study." Exhibit 5. This study was to address the following specific issues: "(1) further evaluation of iatrogenic failures to address issues raised by the April 2005 Panel, (2) the characterization of when surgical instrument damage occurs, (3) further evaluation and

characterization of failures due to localized shell stress, and (4) any correlation between surgical factors (e.g., incision size) and device rupture." Mentor was also required to update their patient and physician labeling to reflect any relevant findings from this study.

39. Mentor's Device Failure Study report of summary findings to the FDA did not list sample size, did not list results of the data findings (no clinical data and no visual inspection data), did not list safety findings, did not list any recommendations or summary of safety and data or follow-up on the data, and did not list any changes to labeling, all in violation of this condition established in the approval of Mentor's PMA.

40. Overall, Mentor blatantly failed to meet the FDA's requirements. Mentor merely filed a report with minimal information just to show that they were following reporting protocol.

### iv.    **Focus Group Study**

41. This condition required Mentor to complete a focus group study of the augmentation and reconstruction patient groups. Exhibit 6. An independent group was to obtain responses from patients on the adequacy of the format and content of the approved labeling. Upon completion of the focus group study, Mentor was to provide a report of the findings and a revised patient and physician labeling based on those findings.

42. Mentor used only 35 women to evaluate how patients understood the safety and labeling brochures. Some respondents concluded that the true purpose of the brochure was to protect Mentor, rather than inform patients about the risks of breast implant surgery. Respondents reported that the information on the labeling did not help them understand the risks and complications associated with breast implants. Respondents also felt the brochure fell short of providing information on the benefits of breast implants and did not acknowledge the deeply personal benefits of body image and self-esteem, especially for women who lose their breast to cancer.

43. The recommendations for labeling changes included adding information clearly describing differences between restoration, replacement, reconstruction, and revision early in the main body of the brochure; adding information on potential complications based on the

1   likelihood of occurrence; providing more information about benefits; and providing more
2   qualitative information to help women make more informed decisions.

3       44.   Despite the long list of recommendations for labeling changes, no further tests were
4   done. Moreover, the small number of women studied and the blatant disregard for the
5   recommendations for labeling exemplifies that the PMA requirements were not met by Mentor.

6                              v.   **Informed Decision Study**

7       45.   The Informed Decision Study required Mentor to distribute their approved patient
8   labeling to all physicians intending to use the silicone gel products. Exhibit 7. Both the physician
9   and the patient were intended to sign designated sections in order to best assure that the patient
10  had obtained the labeling in sufficient time prior to surgery to read it and understand the risks
11  and other information associated with the Mentor device. Mentor was to conduct the survey
12  randomly, selecting 50 physicians on an annual basis, collect the results and provide a summary
13  of the findings to the FDA under the condition the FDA was to evaluate the findings and advise
14  Mentor if and when the annual survey was no longer necessary. In addition, Mentor was to
15  provide training on this process as part of their physician training program.

16      46.   The summary of findings filed by mentor did not list the sample size of patients
17  enrolled. It only provided insight for one year (2011) and reported that 54 surveys were returned
18  by 50 physicians and did not list what went into the survey or which points were assessed.

19                              vi.   **Mentor Adjunct Study**

20      47.   The final condition imposed by the FDA required Mentor to continue the adjunct
21  study. Exhibit 8. This study was originally designed to serve a public health need for
22  reconstruction and revision patients, but because that need was no longer an issue (because of
23  the PMA), Mentor was required to: (1) cease new patient enrollment into the study, and (2)
24  continue to follow-up on all currently-enrolled Mentor Adjunct Study patients through 5 years.
25  The data from the follow-up study was to be reported as part of the annual reports required by
26  the PMA.

27      48.   In addition to addressing the health needs of reconstruction and revision patients,
28  the study was to gather data regarding short-term implant complications.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**FIRST AMENDED COMPLAINT AND JURY DEMAND**                                    11

49.     After completion of the study, Mentor reported on only 36.8% of the patients in the reconstruction cohort; 49.7% revision-reconstruction cohort; and approximately 33% of the revision-augmentation cohort. Mentor reported to the FDA that "poor patient compliance significantly limited interpretation of the available safety results."

**D.    Mentor Violated the PMA Conditions**

50.     Mentor's duty to the scientific community and women who have undergone augmentation for any reason—at the insistence of the FDA—was to design an effective study. It was Mentor's obligation to design and execute a study where women were able to access internet forms that are easily understood and provide a working forum to report their experience with implants. Mentor intentionally and systematically failed to make this happen which is a violation of the FDA's conditions for approval. Data collection was sparse and potential serious side effects and harmful complications were downplayed and under-reported due to inadequate sample size.

51.     All six of these studies were supposed to support long-term safety. The poor follow-up rates and inadequate data confirm Mentor's intentional and systematic failure to follow FDA requirements. Halfway through the ten-year prospective post-marketing studies mandated by the FDA, well over 50% of the 80,000 women in the study groups were dropped or otherwise eliminated from the studies. Of the patients who were accounted for, significant numbers reported systemic ailments which can only be attributed to gel bleed introducing known toxins including silicone, heavy metals and chemicals into their bodies. Mentor was aware, or should have been aware that the gel contained chemicals and metals toxic to the human body but failed to adequately report that to the FDA and warn their patients of their dangerous consequences.

52.     It has also been reported that the silicone is more likely to leak, even when the implants are intact, and that platinum used in the implants is more dangerous than reported. Mentor knew of these risks associated with implants, but covered them up by terminating studies, sponsoring only self-serving research they could control, and by misrepresenting the risks to the users, physicians, and regulatory agencies.

Law Offices
Cotchett, Pitre &
McCarthy, LLP

**FIRST AMENDED COMPLAINT AND JURY DEMAND**                                    12

53.     Defendant's post-approval obligations under federal law included, but are not limited to:

    a.  report to the FDA information suggesting that one of the Manufacturer's devices may have caused or contributed to a death or serious injury, or has malfunctioned and would be likely to cause death or serious injury if the malfunction were to recur, 21 CFR §§ 803.50 et seq.;

    b.  monitor the product after pre-market approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product, 21 CFR §§ 814 et seq.;

    c.  submit a PMA Supplement for any change in Manufacturing Site, 21 CFR §§ 814.39 et seq.;

    d.  establish and maintain quality system requirements to ensure that quality requirements are met, 21 CFR § 820.20 et seq.;

    e.  establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, 21 CFR §§ 820.30 et seq.;

    f.  document all Corrective Action and Preventative Actions taken by the Manufacturer to address non-conformance and other internal quality control issues, 21 CFR §§ 820.100 et seq.;

    g.  establish internal procedures for reviewing complaints and event reports, 21 CFR §§ 820.198, §§ 820.100 et seq. and §§ 820.20 et seq.;

    h.  establish Quality Management System (QMS) procedures to assess potential causes of non-conforming products and other quality problems, 21 CFR §§820.70 et seq. and 21 CFR §§ 820.90 et seq.;

    i.  report on Post Approval Studies in a timely fashion, 21 CFR §§ 814.80 et seq.; and

    j.  advertise the device accurately and truthfully, 21 CFR §§ 801 et seq.

54. Had Defendants fulfilled these obligations, which federal and state law required them to do, Plaintiff's injuries would not have occurred. Defendants failed to do so.

**E.** **Mentor Intentionally Failed to Warn Patients and Doctors**

55. Mentor's Product Insert Data Sheet (Exhibit 9) regarding the implants state that "[s]mall quantities of low molecular weight (LMW) silicone compounds, as well as platinum (in zero oxidation state), have been found to diffuse ("bleed") through an intact implant shell.....Mentor performed a laboratory test to analyze the silicones and platinum (used in the manufacturing process), which may bleed out of intact MemoryGel Breast Implants into the body....Over 99% of the LMW silicones and platinum stayed in the implant. The overall body of available evidence supports that the extremely low level of gel bleed is of no clinical consequence."

56. Arsenic, antimony, barium, cobalt, mercury, nickel, copper, zinc, chromium, titanium, vanadium, selenium, tin, and molybdenum in high levels were all found in Ms. Ebrahimi's body during her toxicology testing. None of these elements were listed in Mentor's Product Insert Data Sheet. Mentor only mentioned silicone compounds and platinum.

57. The nature and extent of Ms. Ebrahimi's injuries and test results demonstrate a significant gel bleed, as opposed a bleed of "small quantities" of gel, or an "extremely low level of gel bleed."

58. Mentor failed to warn consumers, healthcare providers, and the FDA that a significant gel bleed was a potential risk, and failed to warn that there were other toxic materials in the gel that posed a substantial danger of injury to the Plaintiff.

59. The risk of a significant gel bleed containing toxic materials was not disclosed or discussed in what Mentor calls its "Directions for Use" or in its consumer labeling, despite the availability of substantial evidence that such was a significant potential risk of use, even in a properly manufactured product.

60. The occurrence of a significant gel bleed, and the presence of neurotoxic levels of arsenic, antimony, barium, cobalt, mercury, nickel, copper, zinc, chromium, titanium, vanadium, selenium, tin, and molybdenum in Ms. Ebrahimi's body shows the following:

a. The implants placed into Ms. Ebrahimi were different from those approved by the FDA;

b. The implants Ms. Ebrahimi received were inconsistent with and deviated from federal requirements and the product specifications submitted to the FDA; and

c. The implants Ms. Ebrahimi received were defective under California law because the implants differed from the manufacturer's designs or specifications, or from other typical units of the same product line.

61.     Mentor knew of multiple risks associated with implants, and responded by terminating studies, sponsoring only self-serving research they could control, and by misrepresenting the risks to the patients, physicians, and regulatory agencies.

62.     Under California law, Defendant had a duty to adequately warn Plaintiff and her doctors about the dangers of Mentor MemoryGel silicone breast implants that were known or knowable to Defendant at the time of distribution. Under both federal and state law, Defendant also has a post-market duty to monitor and report adverse events and risks associated with the device. Despite having knowledge and possession of evidence that showed the use of Mentor MemoryGel silicone breast implants were dangerous and likely to place consumers' health at serious risk, Defendant failed to disclose and warn of the health hazards and risks associated with the product. Instead, Defendant marketed, advertised, and promoted the product while failing to monitor, warn, or otherwise ensure the safety and efficacy of its users in violation of California law.

## V.     VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION

### Strict Product Liability—Failure To Warn

(Against All Defendants)

63.     Plaintiff incorporates and re-alleges every allegation set forth in Paragraphs 1-62.

64.     At all times relevant herein, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the Mentor MemoryGel Silicone Gel Breast Implants.

65.     At all times relevant herein, Defendants intended for the MemoryGel Silicone Gel Breast Implants to be surgically implanted into the bodies of members of the general public, including Plaintiff, and knew or should have known that the product would be surgically implanted into members of the general public, including Plaintiff.

66.     The MemoryGel Silicone Gel Breast Implants had the potential to cause injury, through leakage of the silicone gel into the tissues of the user's body, thereby introducing toxic metals and chemicals into those tissues, resulting in serious, dangerous and harmful side effects and complications all to the detriment of the health and well-being of the users of their product, including Plaintiff.

67.     This potential to cause injury through leakage was known or knowable in light of the scientific and/or medical knowledge that was generally accepted in the scientific community at the time of the manufacture, distribution, and sale of the MemoryGel Silicone Gel Breast Implant that was used in Plaintiff's surgery.

68.     This potential to cause injury through leakage presented a substantial danger when the MemoryGel Silicone Gel Breast Implant is used or misused in an intended or reasonably foreseeable way.

69.     Plaintiff and her doctors used the MemoryGel Breast Implant in the manner intended by Defendants and/or in a manner reasonably foreseeable by Defendants.

70.     Ordinary users, including Plaintiff and her physicians, could not, in the exercise of reasonable care, have recognized the potential for defects herein mentioned and perceived their danger.

71.     Mentor failed to adequately warn or instruct of the potential risk for injury, as described above, from leakage from the MemoryGel Silicone Gel Breast Implant.

72.     Adequate warnings, including potential risks of injury due to significant gel bleed, that may follow the foreseeable use of the MemoryGel Silicone Gel Breast Implant, were not given to Plaintiff's physicians.

73.     Defendants had a continuing duty to warn Plaintiff and her doctors of the dangers associated with the MemoryGel Silicone Gel Breast Implants, as long as the product remains in use.

74.     As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered severe and permanent physical injuries. Plaintiff has endured, and will continue to endure, substantial pain and suffering. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff has suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally and economically injured.

75.     The wrongful acts, representations and/or omissions of Defendants, hereinabove set forth, were made, adopted, approved, authorized, endorsed and/or ratified by Defendants' officers, directors, or managing agents, and were done maliciously, oppressively, fraudulently and/or with a willful and knowing disregard of the probably dangerous consequences for the health and safety of its products users, including Plaintiff. In making, adopting, approving, authorizing, endorsing and/or ratifying such conduct hereinabove set forth, the officers, directors and/or managing agents of Defendants acted with a willful and/or knowing disregard of the probably dangerous consequences, and/or acted with an awareness of the probably dangerous consequences of their conduct and deliberately failed to avoid those consequences, thereby creating a substantial risk of injury to Plaintiff and other users of their products. Plaintiffs are entitled to punitive and exemplary damages in an amount to be ascertained, which is appropriate to punish to set an example of Defendants and deter such behavior by them in the future.

WHEREFORE, Plaintiff prays as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Strict Product Liability—Manufacturing Defect

**FIRST AMENDED COMPLAINT AND JURY DEMAND**                    17

(Against All Defendants)

76.    Plaintiff incorporates and re-alleges every allegation set forth in Paragraphs 1-75.

77.    Defendants manufactured, distributed and sold the MemoryGel Silicone Gel Breast Implants that were implanted into Plaintiff's body.

78.    The MemoryGel Silicone Gel Breast Implant implanted into Plaintiff's body was being used, at the time of her surgery, in a manner intended by or reasonably foreseen by the Defendant when it manufactured, distributed, and sold the implant.

79.    At the time Defendants manufactured, distributed, and sold the MemoryGel Silicone Gel Breast Implant that was implanted into Plaintiff's body, the implant contained a manufacturing defect in that the implant differed from the manufacturer's design or specifications or from other typical units of the same product line.

80.    The manufacturing defects described herein were a substantial factor in causing toxins contained in the gel to seep into the tissues of her body within a short time after the implants were placed in her body, resulting in Plaintiff's injuries and damages as herein alleged.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as set forth below:

A.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

B.    Pre-judgment and post-judgment interest on such monetary relief;

C.    Equitable relief in the form of an injunction prohibiting the illicit conduct described herein;

D.    The costs of bringing this suit, including reasonable attorneys' fees; and

E.    All other relief to which Plaintiff may be entitled at law or equity.

///
///
///
///
///
///
///

**FIRST AMENDED COMPLAINT AND JURY DEMAND**                                    18

DATED: October 6, 2017          **COTCHETT, PITRE & McCARTHY, LLP**

                                By: _____
                                       Robert B. Hutchinson

                                *Counsel for Plaintiff Sara Ebrahimi*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a jury trial on any and all claims so triable.

DATED: October 6, 2017          **COTCHETT, PITRE & McCARTHY, LLP**

                                By: _____
                                       Robert B. Hutchinson

                                *Counsel for Plaintiff Sara Ebrahimi*