JOSEPH W. COTCHETT (36324)
jcotchett@cpmlegal.com
ROBERT B. HUTCHINSON (45367)
rhutchinson@cpmlegal.com
NEDA L. LOTFI (290213)
nlotfi@cpmlegal.com
JOEL M. GORDON (SBN 280721)
jgordon@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Boulevard, Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008
Facsimile: (310) 392-0111

*Counsel for Plaintiff Sara Ebrahimi*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA EBRAHIMI, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MENTOR WORLDWIDE LLC;<br>JOHNSON & JOHNSON SERVICES, INC;<br>and DOES 1-50<br><br>Defendants. | Case No. 2:16-cv-07316-DMG-KS<br><br>Hon. Dolly M. Gee<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** |

## TABLE OF CONTENTS

Page

I. Introduction ................................................................................................... 1

II. STATEMENT OF FACTS ............................................................................ 1

    A. PMA Approval and Mandated Studies ............................................... 1

    B. Ms. Ebrahimi's Injuries ....................................................................... 3

III. LEGAL ARGUMENT ................................................................................... 5

    A. **Legal Standard** ................................................................................... 5

    B. **The SAC's Failure to Warn Claim Should Not Be Expressly Preempted** ....... 5

        a. The SAC argues a clear parallel state law claim ....................... 6

        b. The SAC successfully pleads a casual nexus between alleged injury and violation ........................................................ 8

    C. The SAC's Failure to Warn Claim Should Not Be Impliedly Preempted .............. 8

    D. The SAC's Manufacturing Defect Claim Should Not Be Preempted ............ 10

IV. CONCLUSION ............................................................................................ 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Barker v. Lull Eng'g Co.,
  20 Cal. 3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978) .................................. 10, 11

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007) ............................................................................................... 5

Coleman v. Medtronic, Inc.,
  223 Cal. App. 4th 413 (2014) ................................................................................ 6

De Buono v. NYSA-ILA Med. & Clinical Servs. Fund,
  520 U.S. 806 (1997) ............................................................................................... 6

Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.,
  213 F.3d 175 (4th Cir. 2000) ................................................................................. 5

Eidson v. Medtronic, Inc.,
  981 F. Supp. 2d 868 (N.D. Cal. 2013) ................................................................... 9

Eidson v. Medtronic, Inc.,
  40 F. Supp. 3d 1202 (N.D. Cal. 2014) ............................................................... 8, 9

Erickson v. Boston Sci. Corp.,
  846 F. Supp. 2d 1085 (C.D. Cal. 2011) ........................................................ 6, 7, 8

Funke v. Sorin Grp. USA, Inc.,
  147 F. Supp. 3d 1017 (C.D. Cal. 2015) ............................................................... 10

Meyers v. Lance,
  Case No. 4:12-cv-215 (CDL), 2012 U.S. Dist. LEXIS 175537 (M.D. Ga. Dec. 12, 2012) ..... 5

Money v. Johnson & Johnson,
  2016 U.S. Dist. LEXIS 70808 (N.D. Cal. 2016) ................................................. 10

Persons v. Salomon N. Am., Inc.
  217 Cal.App.3d 168 (1990) ................................................................................... 7

Riegel v. Medtronic
  552 U.S. 312 (2008) ............................................................................................... 1

Stengel v. Medtronic, Inc.
  704 F.3d 1224 (2012) ..................................................................................... passim

Wag More Dogs, LLC v. Cozart
  680 F.3d 359 (4th Cir. 2012) ................................................................................. 5

*Weaver v. Ethicon, Inc.*
  2016 U.S. Dist. LEXIS 169592 (S.D. Cal.) .................................................................. 5, 6

**Statutes**

21 C.F.R. § 801 et seq. ........................................................................................................ 7

21 C.F.R. § 803.50(a) .......................................................................................................... 5

21 C.F.R. § 820.20 et seq. ................................................................................................. 10

21 C.F.R § 820.70. ............................................................................................................ 10

21 C.F.R § 820.90 et seq. .................................................................................................. 10

21 C.F.R § 820.100 et seq. ................................................................................................ 10

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ..................................................................... 5, 11

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS;
Case No. 2:16-cv-07316-DMG-KS

iii

## I. INTRODUCTION

Plaintiff Sara Ebrahimi ("Plaintiff" or "Ebrahimi"), by and through her attorneys, respectfully submits this memorandum of points and authorities in opposition to Mentor's Motion to Dismiss the Plaintiff's Second Amended Complaint ("SAC").

Following this Court's dismissal of the initial complaint, with leave to amend, Plaintiff has added facts necessary to plead parallel state-law claims against Mentor for failure to warn and manufacturing defect. Despite clear authority on this matter from the Ninth Circuit, however, Defendant still insists that "established Supreme Court precedent" somehow prevents Plaintiff from bringing any claims against a manufacturer of a Class III medical device. This "Supreme Court precedent" to which Defendant alludes is apparently *Riegel v. Medtronic*, 552 U.S. 312 (2008), which the Ninth Circuit has interpreted as permitting state-law claims that parallel, rather than add to, any violations of federal law. *Stengel v. Medtronic, Inc.*, 704 F.3d 1224 (2012). As long as Plaintiff successfully pleads state-law claims for failure to warn and manufacturing defect that do not add to the duties required under the PMA, *Stengel* clearly holds that the case cannot be dismissed on the grounds of express or implied preemption. Ms. Ebrahimi, in the SAC, has met the standard established by *Stengel* for making parallel state claims for failure to warn and manufacturing defect. Therefore, Mentor's Motion should be denied in its entirety.

## II. STATEMENT OF FACTS

### A. PMA Approval and Mandated Studies

On June 5, 2013, Ms. Ebrahimi, a healthy young woman without any prior chronic illnesses, underwent Bilateral Breast Augmentation, during which she was implanted with Mentor's MemoryGel Silicone Gel Breast Implants. Complaint at ¶ 16. Defendant had submitted this implant for premarket approval ("PMA") in 2003, which the FDA had granted in 2006, with approval conditioned on the maintenance of six post-approval studies to further characterize the safety and effectiveness of the implant. *Id.* at ¶ 6. Prior to granting Mentor a PMA for the implant at issue, the FDA required Mentor to (1) continue and complete their **core post-approval study**; (2) conduct a **large post-approval study** to assess long-term outcomes and identify rare adverse events by enrolling 41,900 silicone gel-filled breast implant patients and 1,000 saline-filled


breast implant patients and follow them for ten years; (3) conduct a **device-failure study** to evaluate how easily patients understand the information in the informed decision brochure about the risks associated with the use of silicone breast implants; (4) complete a **focus-group study** to evaluate how easily patients understand the information in the informed decision brochure about the risks associated with silicone breast implants, with a report of the focus group study findings and recommendations provided as a supplement for patient and physician labeling; (5) complete an **informed decisions study** to monitor the process of how patient labeling is distributed to women considering silicone gel-filled breast implants; and (6) complete the **Mentor adjunct study**, which was in place after 1992, when the FDA allowed Mentor to market silicone gel-filled breast implants for reconstruction after mastectomy, correction of congenital deformities, or replacement of existing implants. *Id.* at ¶ 27.

Mentor failed to report the following adverse events from the six new or ongoing studies commissioned as part of implant's PMA approval, all of which would have led to reports suggesting the device's contribution to death or serious injury: (1) The core post-approval study showed a follow-up of only 59%, with reporting done only for six of the ten required years. *Id.* at ¶¶ 28-33. In the primary augmentation cohort, Mentor only reported the reasons for reoperation in 36% of the sample, with fully 47% of women in this cohort needing reoperation for which Mentor failed to document or explain the reasons. *Id.* (2) The large post-approval study only enrolled 41,451 patients, nearly 10,000 fewer than the PMA required. Of those patients, 113 did not provide important information. *Id.* at ¶¶ 34-7. By year seven, the overall follow-up rate for this study was only 20.1%. (*Id.*) (3) The device failure study did not list sample size, did not list results of the data findings (no clinical data and no visual inspection data), did not list safety findings, did not list any recommendations or summary of safety and data or follow-up on the data, and did not list any changes to labeling, all in violation of this condition established in the PMA order. *Id.* at ¶¶ 38-40. (4) The focus group study used only 35 women in its study, which reported that most of the product labeling information "did not help respondents weight the relative importance of risks and complications associated with breast implants," and there is no indication that labeling changes were made in accordance with this study's recommendations, as

required by the PMA. *Id.* at ¶¶ 41-44, Ex. 6 to Compl. (5) For the informed decision study, Mentor did not file a list of the sample size or the patients enrolled, and provided minimal information on the outcome. *Id.* at ¶¶ 45-6. (6) For the Mentor adjunct study, Mentor reported on only 36.8% of the patients in the reconstruction cohort, 49.7% of the patients in the revision-reconstruction cohort, and approximately 33% of the patients in the revision-augmentation cohort. *Id.* at ¶¶ 47-9.

### B. Ms. Ebrahimi's Injuries

Almost immediately after receiving the Mentor implants, Ms. Ebrahimi began to experience symptoms that were found by her physicians to be related to the implant itself: pain, hardening, enlarged lymph nodes, fatigue, and weakness. *Id.* at ¶ 17. Although she underwent revision surgery due to malposition, the symptoms persisted. Id. at ¶ 18. Within a year, Ms. Ebrahimi developed high homocysteine, a moderate level of CRP, photosensitivity with hives and itching after sun exposure, brittleness and cracking of her nails, easy bruising, shortness of breath, poor wound healing, cognitive difficulties, and immune dysfunction. *Id.* at ¶ 19. By June 2015, she began experiencing slow shrinkage of both breasts. *Id.* at ¶ 20. She had a metallic taste in her mouth, suffered from night sweats, headaches, foul body odor, cognitive dysfunction, nausea, and dizziness. *Id.* In July 2015, she was diagnosed with Lymphadenopathy, which is a swelling of the lymph nodes, indicative of infection. *Id.* An ultrasound procedure on the left side revealed extremely dense breast tissue. *Id.* Ms. Ebrahimi's symptoms continued to worsen, so she had more bloodwork done in January 2016. *Id.* at ¶ 21. The results revealed low white blood cells, increasing thyroid antibodies/autoimmune antibodies, EBV (Epstein—Barr virus, which is a type of herpes), CMV (Cytomegalovirus, another type of herpes), and varicella zoster (another type of herpes). *Id.* These results are indicative of a generalized weakened condition. *Id.* By February 7, 2016, Ms. Ebrahimi's chronic, incapacitating fatigue and illness forced her to move from Los Angeles to Seattle to live with her parents so that they could care for her. *Id.*

Throughout the first half of 2016, Ms. Ebrahimi's symptoms continued to worsen. *Id.* at ¶ 22. She also developed Hashimotos disease (an autoimmune disorder in which the immune system attacks the body's own tissues), skin rashes, and digestive and gastrointestinal issues. *Id.*

New bloodwork in May 2016 showed high levels of homocysteine (increasing the risk of stroke and heart disease) and other abnormalities, all of which indicated a systemic toxicity due to her body fighting the implants. *Id.* As a result, her physician recommended removal of her implants. *Id.* In July 2016, Ms. Ebrahimi underwent heavy metal testing and was found to have excessive levels of 10 different metals and detected levels of five different metals listed in Mentor's PMA Summary of Effectiveness, including arsenic, antimony, barium, cobalt, mercury, nickel, copper, zinc, chromium, titanium, vanadium, selenium, tin, and molybdenum. *Id.* She was diagnosed with silicone toxicity, and strongly advised that it was medically necessary to have the implants removed immediately. *Id.*

Ms. Ebrahimi had her implants removed on November 26, 2017, after which the implants and capsules were sent for analysis by Dr. P. Blais. *Id.* Dr. Blais made the following preliminary findings: (1) capsular contracture, a response of the immune system to toxic materials, which develops when internal scar tissue forms a tight or constricting capsule around a breast implant, contracting it until it becomes misshapen and hard; (2) poor quality of workmanship and patch defects; (3) shell failure, as the shell failed to confine the gel which contained metals; and (4) evidence of intracapsular bleeding. *Id* at ¶ 25.

Prior to the original implantation, both Ms. Ebrahimi and her surgeon reviewed Mentor's Product Insert Data Sheet, which states that "[s]mall quantities of low molecular weight (LMW) silicone compounds, as well as platinum (in zero oxidation state), have been found to diffuse ("bleed") through an intact implant shell…..Mentor performed a laboratory test to analyze the silicones and platinum (used in the manufacturing process), which may bleed out of intact MemoryGel Breast Implants into the body….Over 99% of the LMW silicones and platinum stayed in the implant. The overall body of available evidence supports that the extremely low level of gel bleed is of no clinical consequence." *Id.* at ¶ 55. The nature and extent of Ms. Ebrahimi's injuries and test results evidence a significant gel bleed, as opposed a bleed of "small quantities" of gel, or an "extremely low level of gel bleed." *Id.* The risk of significant gel bleed containing toxic materials was not disclosed or discussed in Mentor's "Directions for Use" or in

its consumer labeling. *Id.* at ¶ 59. The Product Insert Data Sheet also did not list several of the metal found in high levels in Plaintiff's blood during toxicology testing. *Id.* at ¶ 56.

## III. LEGAL ARGUMENT

### A. Legal Standard

In order to satisfy a challenge under Rule 12(b)(6), a complaint need only allege "enough facts to state a claim to relief that is plausible on its face" (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), or sufficient facts to "raise a right to relief above the speculative level." *Id.* at 555; see also *Meyers v. Lance*, Case No. 4:12-cv-215 (CDL), 2012 U.S. Dist. LEXIS 175537, *1-2 (M.D. Ga. Dec. 12, 2012). "[O]nly the legal sufficiency of the complaint, and not the facts in support of it, are tested under a Rule 12(b)(6) motion." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.*, 213 F.3d 175, 180 (4th Cir. 2000). Accordingly, the Court must "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Id.* A plaintiff may "establish 'facial plausibility' by pleading 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)). A well-pled complaint may not be dismissed even if "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

### B. The SAC's Failure to Warn Claim Should Not Be Expressly Preempted

Defendant ignores clear Ninth Circuit precedent, set by *Stengel*, in order to elide the fact that it violated state tort law for failing to warn Ms. Ebrahimi or her doctors about a harmful product. While there may be no "state-law duty to conduct post-approval studies," as Defendant's motion claims, "a failure to report adverse events to the FDA" can form the basis of a parallel negligence claim that survives preemption, as they do here. *Weaver v. Ethicon, Inc.*, 2016 U.S. Dist. LEXIS 169592 at *16 (S.D. Cal.) (citing *Stengel*, 704 F.3d at 1233; see also *Anderson v. Medtronic, Inc.*, 2015 U.S. Dist. LEXIS 61750 at *7 (S.D. Cal.)). California law creates a duty to warn parallel to 21 C.F.R. § 803.50(a), as a device manufacturer can be found liable if it "did

not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution.'" *Weaver v. Ethicon, Inc.*, 2016 U.S. Dist. LEXIS 169592 at *17; *Coleman v. Medtronic, Inc.*, 223 Cal. App. 4th 413, 428 (2014) (quoting *Anderson v. Owens-Corning Fiberglass Corp.* (1991), 53 Cal. 3d 987, 1002).

### a. The SAC argues a clear parallel state law claim.

Section 360k of the Medical Devices Act ("MDA") "does not prevent a state from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Stengel*, 704 F.3d at 1228 (noting also that "there is a presumption against federal preemption of state laws that operate in traditional state domains" and that "parties seeking to invalidate a state law based on preemption 'bear the considerable burden of overcoming "the starting presumption that Congress does not intend to supplant state law,"' *Id.* at 1227-8, citation to *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund.*, 520 U.S. 806, 814 (1997).) "To properly plead parallel claims that survive preemption, a plaintiff must allege facts (1) showing an alleged violation of FDA regulations or requirements related to [the device], and (2) establishing a causal nexus between the alleged injury and the violation." *Erickson v. Boston Sci. Corp.*, 846 F. Supp. 2d 1085, 1092 (C.D. Cal. 2011).

The pleadings, as amended in the SAC, run parallel to the federal regulations enforced in the PMA without adding any additional obligations not included in the PMA. Contrary to Defendant's assertions, Ms. Ebrahimi does not premise either of her causes of action *solely* on the violation of the FDA's premarket approval ("PMA") conditions. Instead, the SAC describes conduct that, while it happens to violate either federal regulations or the FDA's conditions for premarket approval, is actionable because it violates California state tort law. As a condition of its PMA, Defendant was required to conduct six post-approval studies in order to provide data on the continued safety and effectiveness of the product. (Complaint at ¶ 13.) The Core Post-Approval Study had a follow-up rate of 59 percent, which was not a sufficient statistical sample for tracking adverse effects. (Id. at ¶ 29.) The Large Post-Approval Study had a follow-up of

only around 20%. (Id. at ¶ 37.) Such a low follow-up rate in the Large Post-Approval Study violated the conditions placed by the PMA, along with California law, in that the doctors and consumers were not adequately warned of complications such as connective tissue disease and neurological disease, which the Plaintiff suffered. (Id. at ¶ 35.) The Focus Group Study's report that the brochure seemed designed to protect Mentor rather than patients, and that the brochure did not properly advise the respondents on how to weigh the risks of breast augmentation, was ignored in subsequent labeling, contrary to the requirements of the PMA. (Id. at ¶¶ 41-44, Ext. 6.) The Product Insert Data Sheet downplayed the risk of gel bleed as being "of no clinical consequence." (Id. at ¶ 55.) Overall, the PMA required Mentor to design effective studies that would provide long-term data to the public in order to give consumers and their physicians a chance to make an informed choice regarding which implants to use. Mentor failed to comply with these FDA requirements, resulting in a deficiency in the reporting of adverse effects. *See Erickson v. Boston Sci. Corp.* 846 F. Supp. 2d at 1092, *supra*.

In addition to failing to provide adequate post-approval studies, as required by the PMA, Mentor failed to provide adequate warnings of "significant gel bleed" in its consumer marketing materials or Product Data Insert Sheet. (Id. at ¶ 55.) Nor did the Product Data Insert Sheet provide warnings about the potential for absorption into the body of potentially toxic metals such as arsenic, antimony, barium, cobalt, mercury, nickel, copper, zinc, chromium, titanium, selenium, tin, and molybdenum, all of which were found in Plaintiff's blood tests prior to explanation of the Mentor product. (Id. at ¶ 56.) This failure to provide adequate warnings of significant gel bleed and toxic metal exposure violate federal rules such as 21 C.F.R. §§ 801 et seq., which require a manufacturer to advertise a medical device accurately and truthfully. (Id. at ¶ 53(j).) These Federal rules have clear parallels in California state law, as described below, that do not add any additional requirements to Federal law.

While there is no state-law duty to conduct post-approval studies, California law — like the Arizona law at issue in *Stengel* — requires a manufacturer to discharge its duty to warn consumers by communicating warnings to a third party in circumstances where such a warning is necessary to put consumers on notice of the danger. See *Persons v. Salomon N. Am., Inc.*, 217

COTCHETT, PITRE &
MCCARTHY, LLP

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS;**
Case No. 2:16-cv-07316-DMG-KS                                                                 7

Cal.App.3d 168 (1990). By maintaining inadequate post-approval studies, Mentor willfully ignored adverse effects that would have been apparent if these studies had been conducted at the capacity and efficiency of what had originally been designed for purposes of the PMA. Under California law, Mentor had a duty to provide adequate warnings, through well-maintained and – reported follow-up studies, to the FDA, with the knowledge that warnings to the FDA would reach the consumer or her physicians. *Eidson v. Medtronic, Inc.,* 40 F. Supp. 3d 1202, 1232 (N.D. Cal. 2014). The PMA requirements asking Mentor to catalogue and report adverse effects to the FDA directly parallels, without adding to, the state-law duties at issue in the SAC.

### b. The SAC successfully pleads a casual nexus between alleged injury and violation

Having successfully pleaded an alleged violation of FDA regulations related to the MemoryGel Silicone Gel device, Ms. Ebrahimi only needs to establish a causal nexus between her injury and Mentor's violation. *Erickson v. Boston Sci. Corp.*, 846 F. Supp. 2d at 1092; *Eidson*, 40 F. Supp. 3d at 1202. In *Eidson*, the court determined that plaintiffs had included studies to show an underreporting of adverse events on a large scale and that, if not for defendants' failure to report those studies, plaintiffs' surgeons would have had access to that adverse data. *Id.* at 1234.

Here, the willful underreporting of test studies has led to an underreporting of adverse effects from Mentor. It was Mentor's duty to design an effective study, but instead created a study for which data collection was sparse and potential serious side effects and harmful complications were downplayed or underreported due to inadequate sample size. (Complaint at ¶ 50.) If the full extent of the product's adverse effects had been reported, neither Plaintiff nor her physician would have selected the product for implantation into her body. (Id. at ¶ 54.) Likewise, if Mentor had provided adequate warnings in the Product Insert Data Sheet, along with its Directions for Use, that "significant gel bleed" was a possibility and that a wide array of toxic metals might enter the patient's body via this significant gel bleed, neither Plaintiff nor her physician would have selected the product for implantation into her body. (Id. at ¶ 72.)

### C. The SAC's Failure to Warn Claim Should Not Be Impliedly Preempted

In its Order, the Court stated, "To the extent Ebrahimi bases her failure-to-warn claim on Mentor's failure to comply with the federal requirement to complete the six post-approval studies, the claim is impliedly preempted," citing to *Eidson* for the rule that "a claim is impliedly preempted under *Buckman* if it is cognizable only by virtue of the FDCA itself, and would not be independently viable under state law absent those provisions." The SAC has remedied what this Court saw as an attempt to plead a failure to warn claim based solely on Mentor's failure to comply with post-approval studies. Instead, as noted above, Plaintiff has alleged that Mentor's failure to provide adverse warnings to Ms. Ebrahimi, her doctors, and the FDA forms the basis for a state-law failure to warn claim, which, as the Ninth Circuit held in *Stengel*, avoids both express and implied preemption.

According to the Court in *Buckman*, "the Federal Government rather than private litigants… are authorized to file suit for noncompliance with the medical device provisions" of the MDA. *Id.* at 349 n.4. In that case, a state law fraud claim based on misrepresentations that defendants made to the FDA during the premarketing approval process was "impliedly preempted because it sought to enforce an exclusively federal requirements and was not grounded in traditional state tort law." *Stengel*, 704 F.3d at 123. State law claims based on conduct that violates the FDCA, however, can evade implied preemption if the alleged wrongdoing "…would state a claim under state law even in the absence of the FDCA." *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 881 (N.D. Cal. 2013). However, that claim will be impliedly preempted "if it is cognizable only by virtue of the provisions of the FDCA itself, and would not be independently viable under state law absent those provisions." *Id.*

While Mentor may have misrepresented its findings to the FDA, Plaintiff has not brought this action to enforce the provisions of the PMA that have been violated. The SAC claims only that in failing to provide adequate data and warnings of adverse events, Plaintiff and her physician were not adequately warned of the dangers posed by "significant gel bleed," something which Mentor would have known about, if it did not already know, had it conducted these post-approval studies to the extent required by the PMA. (Complaint at ¶ 72.) State-law failure to

warn duties, in this sense, are parallel to the duties required by the PMA. Therefore, there is no implied preemption.

### D. The SAC's Manufacturing Defect Claim Should Not Be Preempted

The SAC is now consistent with the Ninth Circuit's ruling in *Stengel*, as described above, that Section 360k of the MDA "does not prevent a state from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Stengel*, 704 F.3d at 1228. Plaintiff's claim for strict liability for manufacturing defects is based on California state tort law that parallels Mentor's post-approval obligations under federal law.

Under the Code of Federal Regulations, as alleged in the SAC, manufacturers must establish and maintain quality system requirements to ensure that quality requirements are met (21 C.F.R. § 820.20 et seq.); establish and maintain quality system requirements to ensure that quality requirements are met (21 C.F.R § 820.20 et seq.); document all Corrective Action and Preventative Actions taken by the Manufacturer to address non-conformance and other internal quality control issues (21 C.F.R § 820.100 et seq.); and establish Quality Management System procedures to assess potential causes of non-conforming products and other quality problems (21 C.F.R §§ 820.70 and 820.90 et seq.). (Complaint at ¶¶ 53(a)-(j).) These federal regulations have parallels under California law, where a manufacturing defect "is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 429, 143 Cal. Rptr. 225, 235, 573 P.2d 443, 453 (1978). Claims for manufacturing defect must show that a suitable design was in place, but that the manufacturing process in some way deviated from the design. *Money v. Johnson & Johnson*, 2016 U.S. Dist. LEXIS 70808 (N.D. Cal. 2016) at *9. A defective manufacturing claim is not preempted insofar as it alleges that the manufacturing of the device both fell short of the FDA's requirements for manufacturing and—based on the same deficiency—was defectively manufactured under California law. *Funke v. Sorin Grp. USA, Inc.*, 147 F. Supp. 3d 1017, 1027 (C.D. Cal. 2015).

The SAC has alleged that explanted capsules analyzed by Dr. P. Blais made the following preliminary findings: (1) capsular contracture, which is a response of the immune system to toxic materials that develops when internal scar tissue forms a tight or constricting capsule around a breast implant, contracting it until it becomes misshapen and hard; (2) poor quality of workmanship and patch defects; (3) shell failure, as the shell failed to confine the gel which contained metals; and (4) evidence of intracapsular bleeding. (Complaint at ¶ 25.) If taken as true, this shows a clear violation of the Code of Federal Regulations sections cited in the SAC that require documentations and procedures for correcting defective products that do not conform to otherwise suitable designs. Mentor did not design a product with patch defects and a shell that would fail to confine the gel, resulting in a leak of toxic metals into a patient's body. The only explanation for Dr. Blais' findings regarding Plaintiff's explanted capsule is that poor workmanship resulted in this non-conforming gel bleed.

While the action has been brought by Plaintiff for conduct that violated these federal regulations, Plaintiff contend that Mentor's liability stems from its violation of California laws parallel to those regulations. (Id. at ¶¶ 76-80.) Similar to *Barker*, the manufacturing defect in the Mentor implant is identifiable because the resulting product, which led to contraction, hardening, patch defects, and a failure to confine the gel, was different from the manufacturer's intended design. (Id. at ¶ 25.) Upon information and belief, a Mentor chemist of fifteen years reported to the FDA that the implants are more likely to break than the company reported. (Id. at ¶ 52.) Therefore, the manufacturing defects alleged in the SAC are in violation of state-law manufacturing defect law rather than solely in violation of the C.F.R. sections cited in the complaint, and, since a parallel duty is cited that is not in addition to the federal requirement, the claim should not be expressly or impliedly preempted.

## IV. CONCLUSION

Based on the above, Plaintiff Sara Ebrahimi respectfully requests that the Court enter an order denying Defendant's Rule 12(b)(6) Motion to Dismiss her Second Amended Complaint, or dismiss the complaint with leave to amend for a third time.

DATED: November 27, 2017                    COTCHETT, PITRE & McCARTHY, LLP

                                            By: _____
                                                Robert B. Hutchinson
                                                Neda L. Lotfi
                                                Joel M. Gordon